[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
SEPTEMBER 30, 2009
THOMAS K. KAHN
CLERK

_____

No. 08-10983

_____

D. C. Docket No. 07-00071-CV-FTM-29-DNF

ALAN STEIN,
KAREN STEIN,

Plaintiffs-
Counter-Defendants-
Counter-Claimants-
Appellees,

versus

PARADIGM MIRASOL, LLC,
a Florida limited liability company,

Defendant-
Counter-Claimant-
Counter-Defendant-
Appellant.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(September 30, 2009)

Before TJOFLAT and CARNES, Circuit Judges, and HOOD,[*] District Judge.

CARNES, Circuit Judge:

In a market-based economy the price of housing, like other goods, is subject to swings. There was a sharp upward swing in housing prices between late 2000 and the end of 2005, and the resulting bubble was bigger in Florida than it was in most other states. Home prices there rose eighty-two percent in absolute terms during that short period, outstripping the national increase by thirty-one percent. See Gabriel Montes Rojas et al., The Florida Housing Boom, 3 Fla. Focus 1, 2 (2007). All bubbles eventually burst, as this one did. The bigger the bubble, the bigger the pop. The bigger the pop, the bigger the losses. And the bigger the losses, the more likely litigation will ensue. Hence this case.

## I.

On March 9, 2005, Alan and Karen Stein signed a contract with Paradigm Mirasol, LLC to purchase for $895,900 a condominium unit in Mirasol I, a six-story condominium building that was being developed in a luxury resort community near Fort Myers, Florida. The Steins made a down payment of $205,370, which included a deposit of $179,180 and an additional payment of

---

[*] Honorable Joseph M. Hood, United States District Court for the Eastern District of Kentucky, sitting by designation.

$26,190 for upgrades. The contract specified that time was of the essence and that the condominium would be built within two years, although the contract included a force majeure provision that allowed for delays under certain circumstances. The contract also specifically waived the Steins' right to speculative, punitive, and special damages. As a result, if Paradigm breached the contract the remedies available to the Steins were limited; they could choose specific performance or they could get back their deposit with interest and any actual damages.

After the housing bubble burst, the Steins had second thoughts about their decision to purchase the condominium unit. Wanting out of their contract, they seized on to the Interstate Land Sales Full Disclosure Act, 15 U.S.C. § 1701 et seq, a federal statute that has become an increasingly popular means of channeling buyer's remorse into a legal defense to a breach of contract claim. On January 16, 2007, just three weeks before the condominium was completed, the Steins gave Paradigm written notice that they were terminating the contract because Paradigm had failed to provide them with a property report as required by the Disclosure Act. The Steins also demanded that Paradigm return all of the $205,370 they had paid. Paradigm refused, contending that the contract between the parties fits within the exemption set out in the Act for "the sale or lease of any improved land on which there is a residential, commercial, condominium, or industrial building, or the sale

3

or lease of land under a contract obligating the seller or lessor to erect such a building thereon within a period of two years." See 15 U.S.C. § 1702(a)(2).

Paradigm did complete construction of the condominium building and the Stein's unit in two years, as it had contracted to do. On February 8, 2007, twenty-three months after the contract was signed, Paradigm provided the Steins with a notice of issuance of the Certificate of Occupancy. That same day, the Steins filed a complaint in district court, alleging that Paradigm had violated the Disclosure Act and seeking to revoke the contract and to recover damages and attorney's fees.[1] Undeterred, Paradigm attempted to schedule a closing date of February 20, 2007, which would have been within the two-year completion period. The Steins refused to close. Paradigm filed a counterclaim seeking to retain the Steins' deposit as liquidated damages.

The parties agreed that the material facts were undisputed and filed cross-motions for summary judgment. The district court granted summary judgment in favor of the Steins, allowing them to terminate the contract and requiring Paradigm to return all of the money the Steins had paid it. The court held that the contract's force majeure clause fatally undermined Paradigm's obligation to complete

---

[1] The complaint also alleged a state law claim for conversion based on Paradigm's refusal to return the deposits.

4

construction within two years because the scope of that clause extended beyond events the law would recognize as establishing impossibility of performance. Additionally, the court held that Paradigm could not claim the two-year completion exemption because the contractual provision barring special damages rendered Paradigm's obligation to construct the condominium "illusory." This is Paradigm's appeal.

## II.

This case turns on whether the contract is exempt from the requirements of the Interstate Land Sales Full Disclosure Act. See 15 U.S.C. § 1702(a)(2). If, as the district court concluded, the contract is not exempt, the Steins are entitled to the judgment they received. If the contract is exempt, Paradigm is entitled to a judgment in its favor. With the judgment goes the money the Steins deposited with Paradigm.

The Disclosure Act is a consumer protection statute that "was intended to curb abuses accompanying interstate land sales." Winter v. Hollingsworth Props., Inc., 777 F.2d 1444, 1448 (11th Cir. 1985). Although its primary purpose is to "protect purchasers from unscrupulous sales of undeveloped home sites," id. at 1447, it also applies to the sale of developed land, including the sale of condominiums, id. at 1449. The Act "utiliz[es] disclosure as its primary tool" to

5

discourage fraud.  Id. at 1447.  It requires developers selling or leasing property to provide the purchaser with a property report before the sales contract is signed. See 15 U.S.C. § 1703(a)(1)(B).  If the developer fails to provide a property report, the purchaser generally has the right to revoke the contract.  Id. § 1703(c). Paradigm did not provide the Steins with the property report.

The Disclosure Act does include a list of exemptions from its requirements. See id. § 1702(a).  The one at the center of this case is the exemption that applies to "the sale or lease . . . of land under a contract obligating the seller or lessor to erect . . . a [condominium] building thereon within a period of two years."  Id. § 1702(a)(2).  The dispute is over the meaning of the word "obligating."  The contract provided that Paradigm would complete construction of the Steins' condominium within two years and Paradigm actually did so.  But was the contract one "obligating" Paradigm to do so within the meaning of the exemption provision in § 1702(a)(2) of the Disclosure Act?  That is the $64,000 question, or more accurately, the $205,370 question in this case.

Deciding whether the contract in this case fits within the § 1702(a)(2) exemption requires that we look to both federal and state law.  Because the Disclosure Act is a federal statute its interpretation is a matter of federal law, Caley v. Gulfstream Aerospace Corp., 428 F.3d 1359, 1369 n.9 (11th Cir. 2005), so we

6

will use principles of statutory interpretation from federal decisions to construe the term "obligating." We must also look to state contract law to see what remedies the Steins would have under the contract if Paradigm had not constructed the condominium within the two-year period specified in the § 1702(a)(2) exemption. See Markowitz v. Ne. Land Co., 906 F.2d 100, 105 (3d Cir. 1990). Florida law will inform us about the extent and nature of Paradigm's legally enforceable obligation to fulfill its contractual promise to complete construction within two years.

We begin our federal law analysis by looking to the text of the Disclosure Act. See Harris v. Garner, 216 F.3d 970, 972 (11th Cir. 2000) (en banc) ("[C]ourts should always begin the process of legislative interpretation . . . with the words of the statutory provision."); United States v. Steele, 147 F.3d 1316, 1318 (11th Cir. 1998) ("In construing a statute we must begin . . . with the language of the statute itself." (quotation marks omitted)). Although the Act defines some terms, neither the word "obligating" nor its variants "obligate" and "obligated" are among them. A term that is undefined in a statute carries its ordinary meaning. Crawford v. Metro. Gov't of Nashville & Davidson County, __ U.S. ___, 129 S. Ct. 846, 850 (2009); Perrin v. United States, 444 U.S. 37, 42, 100 S. Ct. 311, 314 (1979).

The ordinary meaning of the word "obligating" is: binding by legal or moral

7

duty.  See Merriam-Webster Online Dictionary, http://www.merriam-webster.com (last visited Sept. 30, 2009) (defining "obligate" as "to bind legally or morally" and "obligation" as "something one is bound to do"); American Heritage Dictionary 857 (2d College ed. 1982) (defining "obligate" as "[t]o bind, compel, or constrain by a social, legal, or moral tie"); Oxford English Dictionary Online, http://dictionary.oed.com (draft rev. 2009) (defining "obligate" as "[t]o bind (a person) morally" or "[t]o bind (a person) legally"); Random House Unabridged Dictionary 1336 (2d ed. 1993) (defining "obligate" as "to bind or oblige morally or legally"); see also Black's Law Dictionary 1103 (8th ed. 2004) (defining "obligate" as "[t]o bind by legal or moral duty").[2]  Federal statutes, generally speaking, concern themselves with legal instead of moral duties, and the Disclosure Act is no exception.

Given the context and the ordinary meaning of "obligating," the § 1702(a)(2) exemption applies when a contract imposes a legal duty on the developer to perform his promise to construct the condominium or other building within two years.  The nature and extent of the duty a contract imposes, however, is a matter of state contract law.  See Norfolk & W. Ry. Co. v. Am. Train Dispatchers Ass'n, 499 U.S. 117, 129, 111 S. Ct. 1156, 1164 (1991) ("The

---

[2] Copies of the internet materials cited in this opinion are on file in the Clerk's Office. See 11th Cir. R. 36, I.O.P. 10.

8

obligation of a contract is the law which binds the parties to perform their agreement." (citation and internal quotation marks omitted)); Sturges v. Crowninshield, 17 U.S. (4 Wheat.) 122, 197 (1819) (Marshall, C.J.) ("A contract is an agreement, in which a party undertakes to do, or not to do, a particular thing. The law binds him to perform his undertaking, and this is, of course, the obligation of his contract."). A legal duty, contractual or otherwise, is one that the law will require a party to perform, or to pay for not performing, by bringing to bear public force. See Am. Banana Co. v. United Fruit Co., 213 U.S. 347, 356, 29 S. Ct. 511, 512 (1909) (Holmes, J.) ("Law is a statement of the circumstances, in which the public force will be brought to bear upon men through the courts."); Oliver Wendell Holmes, Jr., The Common Law 40 (M. Howe ed. 1963) ("The law threatens certain pains if you do certain things, intending thereby to give you a new motive for not doing them.").

## A.

If it appeared to the Steins that Paradigm was not going to complete construction within two years, they had available the remedy of specific performance to force Paradigm to live up to its agreement. Or, if the Steins preferred, they could have waited until it was too late for Paradigm to finish by the deadline. At that point their remedy would have been to rescind the contract, get

9

their money back with interest, and recover any actual damages they had suffered.[3]

The Steins contend that those remedies are not good enough to "obligate" Paradigm to construct the condominium in two years, as required by § 1702 (a)(2) of the Disclosure Act. They argue that without the remedies of special, consequential, punitive, speculative, and indirect damages, which they expressly waived in the contract, they cannot inflict enough legal pain on Paradigm to force it to carry out its contractual duty to finish within two years.

Specific performance or injunctive relief, if vigorously pursued, ordinarily will be enough to force a seller to fulfill its contractual obligations within the time a contract requires. Florida law provides that a party may sue for specific performance and obtain an injunction that "shall specify the time within which the act shall be performed." Fla. R. Civ. P. 1.570(c); see also Wilson v. Sandstrom,

---

[3]The remedies clause of the contract provided:

> If, for any reason other than Seller's failure to make Seller's title marketable, Seller fails to perform this Agreement and Buyer is not in default of this Agreement, Buyer may seek specific performance or elect to terminate this Agreement by written notice to Seller, in which event the deposit shall be returned to Buyer upon demand, with any interest accrued thereon, and Buyer may commence an action to recover only actual and direct damages (out-of-pocket amounts actually paid by Buyer to third parties). Under no circumstances may Buyer seek or be entitled to recover any special, consequential, punitive, speculative or indirect damages, all of which Buyer specifically waives, from Seller for any breach by Seller of its obligation under this Agreement or any representation, warranty or covenant of Seller hereunder.

(emphasis added).

317 So. 2d 732, 736 (Fla. 1975) ("A mandatory temporary injunction may be issued requiring specific performance of a contract."). If it had appeared to the Steins that Paradigm was not moving quickly enough to complete construction within two years, they could have obtained an injunction to force it to do so. Failure to comply with the injunction requiring it to finish construction within two years would have subjected Paradigm to civil and criminal contempt penalties. Roth v. Roth, 973 So. 2d 580, 592 (Fla. 2d DCA 2008) (recognizing that a party may be held in contempt "for failing to perform a specific act" required by a specific performance judgment); Riley v. Riley, 509 So. 2d 1366, 1367–70 (Fla. 5th DCA 1987) (holding that a judgment that "requires the performance of an act" is enforceable by civil and criminal contempt penalties (emphasis omitted)); Firestone v. Ferguson, 372 So. 2d 490, 492 (Fla. 3d DCA 1979) (holding that a party may be held in contempt for refusing to comply with a specific performance judgment requiring the party to sell a piece of real estate).

A court order requiring a party to perform as it promised or face civil and criminal contempt sanctions obligates the party to keep its contractual promise. The theory behind injunctive relief, after all, is that parties can be forced to take action that the law demands. Because Florida law provided the Steins with the remedy of injunctive relief to force Paradigm to finish construction of the

11

condominium within two years, the contract was one "obligating" Paradigm to do so.

It might be argued that Paradigm could evade its obligation under the contract and thwart the specific performance remedy simply by conveying the property to another purchaser, as it would have had a special incentive to do if the market value of the property had gone up. It is true that injunctive relief is not available where the property is conveyed to another purchaser before the injunction issues. See Samara Dev. Corp. v. Marlow, 556 So. 2d 1097, 1101 (Fla. 1990) ("Specific performance alone is not sufficient because the developer could sell the property to a third party in the interim, thereby nullifying the availability of specific performance."). In that situation, however, Florida law provides for more than specific performance, regardless of what the contract says about remedies. Under Florida law, notwithstanding any contractual limitation of remedies, when the seller frustrates the buyer's specific performance right by selling the property to someone else, the buyer may recover the seller's entire profit from the sale. See Seaside Cmty. Dev. Corp. v. Edwards, 573 So. 2d 142, 146–47 (Fla. 1st DCA 1991) (holding that even though the contract limited the buyers' remedies to specific performance or a refund of earnest money, they were entitled to damages in the amount of the difference between the contract price and the fair market value

12

of the property where the seller thwarted the buyers' right to specific performance by selling the property to another at a higher price). Thus, Paradigm would not have been able to deprive the Steins of the benefit of their bargain and take for itself any increase in the market value of the condominium during the construction period. Florida law would not permit that, regardless of the contract's remedies limitation clause.[4]

As a result, even with the limitation of remedies clause, the Steins had an effective remedy to enforce Paradigm's contractual promise to complete the construction of the condominium within two years. They could have obtained an injunction and brought to bear the threat of civil and criminal contempt if Paradigm was in the process of breaching by not working fast enough. Or if Paradigm had breached the contract by selling the property to another buyer, the Steins could have recouped the benefit of their bargain in the form of damages equal to the difference between their contract price and the fair market value of the property. That is in addition to the return of their deposit with interest. Insofar as remedies are concerned, the law would have threatened or inflicted enough pain on

---

[4] Regardless of any breach by Paradigm, the Steins would not have been able to recover speculative or punitive damages. As the district court pointed out, however, under Florida law those types of damages are not recoverable for breach of contract anyway. See A.R. Holland, Inc. v. Wendco Corp., 884 So. 2d 1006, 1008 (Fla. 1st DCA 2004) (speculative damages); Ferguson Transp., Inc. v. N. Am. Van Lines, Inc., 687 So. 2d 821, 822 (Fla. 1996) (punitive damages). So for those types of damages, the limitations of remedies clause had no effect.

Paradigm for breaching the contract to make the contract one "obligating the seller or lessor to erect such a building thereon within a period of two years" within the meaning of § 1702 (a)(2).[5]

**B.**

Alternatively, the Steins contend that even if the contract's limitation of remedies clause does not take it out of the § 1702 (a)(2) exemption, the force majeure clause does. That clause provides:

> Construction of the condominium unit will be complete and ready for possession within two (2) years from the execution of this Purchase Agreement in compliance with the Interstate Land Sales Full Disclosure Act; provided, however, that Seller shall not be responsible for <u>any delay caused by acts of God, weather conditions, restrictions imposed by any governmental agency, labor strikes, material shortages or other delays beyond the control of the Seller</u> and the completion and occupancy date shall be extended accordingly.

(emphasis added).

The district court concluded that this force majeure clause rendered "the apparent obligation [to complete construction in two years] illusory." As two examples of what could have happened, the court pointed to a Florida case where

---

[5] The Florida Supreme Court has interpreted the Disclosure Act differently than we do. See <u>Samara</u>, 556 So. 2d at 1099–1101. Although we respect its views, we are not bound by <u>Samara</u>'s interpretation even in cases arising in Florida because it is a federal statute we are interpreting. The <u>Samara</u> Court appears to have applied Florida statutory construction decisions in arriving at its conclusion. For example, it explicitly applied state law to give "great weight" to the HUD guidelines, <u>id.</u> at 1099, which is far more weight than we can give them under <u>Skidmore v. Swift & Co.</u>, 323 U.S. 134, 140, 65 S. Ct. 161, 164 (1944). <u>See infra</u> note 6.

14

delay was excused under a similarly worded force majeure clause due to excessive rain and another one where the president of the development company's heart attack was held to be beyond the control of the company for force majeure purposes. See Devco Dev. Corp. v. Hooker Homes, Inc., 518 So. 2d 922, 923 (Fla. 2d DCA 1987) (excessive rain); Camacho Enters., Inc. v. Better Constr., Inc., 343 So. 2d 1296, 1297 (Fla. 3d DCA 1977) (heart attack). The court then concluded that the force majeure clause rendered Paradigm's obligation illusory under the Disclosure Act because the clause excuses delays that would "not qualify under Florida's impossibility of performance principles." Neither the district court nor the Steins have explained why the standard of legal impossibility should be the measure of obligation under the § 1702 (a)(2) exemption—why any force majeure clause that extends beyond legal impossibility renders a contract non-exempt.[6]

---

[6] Paradigm argues that the force majeure clause is limited to legal impossibility because "Florida law construes force majeure clauses to exclude only those delays that are excusable under the doctrine of impossibility." To support that contention, Paradigm cites Florida Power Corp. v. City of Tallahassee, 18 So. 2d 671, 675 (Fla. 1944), but that decision does not shoulder the proposition. In Florida Power the delay was caused by a hurricane—an act of God. Id. The court was concerned with only that kind of delay. That does not mean the court was narrowing the force majeure clause at issue (and all force majeure clauses in all Florida contracts) to cover only acts of God.

It appears to us that force majeure clauses broader than the scope of impossibility are enforceable under Florida law. See Devco, 518 So. 2d at 923 (holding that excessive rain excused delay under the contract's force majeure clause as a condition outside of the seller's control); St. Joe Paper Co. v. State Dep't of Envtl. Regulation, 371 So. 2d 178, 180 (Fla. 1st DCA 1979) (implicitly recognizing that a force majeure clause excusing delays for "any cause . . . not within the reasonable control of the company" was enforceable); Camacho, 343 So. 2d at 1297 (enforcing the contract's force majeure clause to excuse delay based on the president of the

15

This force majeure clause covers events that may or may not happen, but whether they do is "beyond the control of the Seller." This type of clause is not an opt-out provision; it is limited in scope. See Gen. Injectables & Vaccines, Inc. v. Gates, 527 F.3d 1375, 1377 (Fed. Cir. 2008) (delays caused by subcontractors are within the builder's control and therefore not excused by "beyond the seller's control" force majeure clauses); Hutton Contracting Co. v. City of Coffeyville, 487 F.3d 772, 779 (10th Cir. 2007) (same); Stand Energy Corp. v. Cinergy Servs., Inc., 760 N.E.2d 453, 457 (Ohio Ct. App. 2001) ("Mistaken assumptions about future events or worsening economic conditions, however, do not qualify as a force majeure."). The clause does not make the two-year duty illusory. See Johnson Enters. of Jacksonville Inc. v. FPL Group, Inc., 162 F.3d 1290, 1311 (11th Cir. 1998) (recognizing the "fundamental principle of contract law" and Florida law that an obligation is illusory when it "appears on its face to be so insubstantial as to impose no obligation at all"); Port Largo Club, Inc. v. Warren, 476 So. 2d 1330, 1333 (Fla. 3d DCA 1985) (recognizing that a contractual provision renders an obligation "illusory" when it allows a party "to breach with impunity"). Nor does the clause make the two-year duty subject to the seller's discretion. Events beyond a party's control are, by definition, not in its discretion.

development company's heart attack as a circumstance "beyond the control" of the developer). We proceed with that understanding.

16

The two examples that concerned the district court do not concern us. Delays caused by excessive rainfall or by the seller suffering a heart attack are not within the seller's control or subject to his whim. No seller can command the sky to open up and more rain to fall, and we are not aware of anyone deliberately inflicting a heart attack on himself to delay the performance of a contractual duty. The Disclosure Act is an anti-fraud statute. See Winter, 777 F.2d at 1447. Allowing for reasonable delays caused by events beyond the seller's control does not promote or permit fraud. It does not transform the seller's obligation into an option. See Atteberry v. Maumelle Co., 60 F.3d 415, 420 (8th Cir. 1995) ("The question is whether [the contractual provision] allows nonperformance by the seller at the seller's discretion." (internal quotation marks omitted)). Even though the contract excuses delays beyond the seller's control, it is still one "obligating" Paradigm to complete construction of the condominium within two years for purposes of § 1702 (a)(2) of the Disclosure Act.[7]

---

[7] The HUD Guidelines state that "as a general rule delay or nonperformance must be based on grounds cognizable in contract law such as impossibility or frustration and on events which are beyond the seller's reasonable control." Guidelines for Exemptions Available Under the Interstate Land Sales Full Disclosure Act, 24 C.F.R. § 1710 appx. A, at A-2, available at www.hud.gov/offices/hsg/ramh/ils/ilsexemp.cfm. They also say that "[c]ontract provisions which allow for nonperformance or for delays for construction completion beyond the two-year period are acceptable if such provisions are legally recognized as defenses to contract actions in the jurisdiction where the building is being erected." Id. The syntax of the first statement makes it ambiguous. Assuming it means what the second statement implies, the guidelines' position is that force majeure clauses that go beyond defenses the law already provides take a contract out of the § 1702 (a)(2) exemption.

## III.

We REVERSE the judgment of the district court and REMAND for judgment to be entered in favor of Paradigm.

---

Because the HUD Guidelines are not "published regulations subject to the rigors of the Administrative Procedure Act, including public notice and comment," they do not deserve full <u>Chevron</u> deference. <u>Reno v. Koray</u>, 515 U.S. 50, 61, 115 S. Ct. 2021, 2027 (1995) (internal quotation marks omitted); <u>see also</u> <u>Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.</u>, 467 U.S. 837, 104 S. Ct. 2778 (1984). A guidelines position is entitled to only as much deference as it merits based on the "thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." <u>Skidmore</u>, 323 U.S. at 140, 65 S. Ct. at 164. Little or no deference is due to the guidelines' position that any force majeure clause that goes beyond events amounting to legal defenses takes the contract out of the § 1702 (a)(2) exemption. No reasoning at all, much less thorough reasoning, is provided for that proposition. And it is inconsistent with the guidelines' other position that remedies limitations do not take a contract out of the exemption unless they excuse nonperformance by the seller "at the seller's discretion" or "permit the seller to breach virtually at will." 24 C.F.R. § 1710 appx. A, at A-1. It is anything but consistent to set the bar that low for remedies limitations and then raise it so much higher for delay caused by events that are out of the seller's control.

18